568-06/MEU

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
LOSINJKA PLOVIDBA,

                                         **06 CIV 13627 (LAP)**

                   Plaintiff,

      -against-

AZELIE CORPORATION and CARGOBULK
PTE LTD.,

                 Defendants.
-------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION BY DEFENDANT CARGOBULK
## <u>TO VACATE THE ATTACHMENT</u>

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff Losinjka Plovidba
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax

Of Counsel:
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

NYDOCS1/274424.1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ... 1

FACTS ... 1

ARGUMENT

Point I

    The Restrained Funds are Property of Azelie
    And so the Attachment Should Be Maintained ... 3

Point II

    Losinjplov Has Sufficient Evidence to
    Demonstrate a *Prima Facie* Case of *Alter Ego* ... 4

Point III

    New York UCC Article 4A is Inapplicable to,
    And is Preempted by, Admiralty Rule B ... 6

    1.    The Doctrine of Preemption – Generally ... 8

    2.    The Enacting Legislation for the Federal
        Rules of Civil Procedure Contains a
        Preemption Clause that Renders Conflicting
        State Law Ineffective ... 9

    3.    The Immunity Provided to Intermediary
        Banks by UCC Article 4A is Preempted
        By Rule B ... 11

    4.    Rules of Statutory Interpretation
        Reinforce the Point that Application of the
        UCC is Inappropriate ... 16

    5.    Cargobulk's Reliance on *Seamar* is
        Entirely Misplaced ... 17

CONCLUSION ... 19

# TABLE OF AUTHORITIES

## Cases

A.Coker & Co. v. Nat'l Shipping Agency Corp., 1999 U.S.
    Dist. LEXIS 7442 (E.D.LA. May 18, 1999)                      6

Allied Marine Services, Ltd. v. LMJ International Ltd., 06
    CIV 3641 (LAK) (unreported, Dec. 8, 2006)                    7

American Dredging Co. v. Miller, 510 U.S. 443 (1994)            7

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460
    F.3d 434 (2d Cir. 2006)                                 6, 7, 18

Business Guides, Inc. v. Chromatic Communications
    Enterprises, Inc., 498 U.S. 533 (1991)                    16, 17

Cohen v. Beneficial Loan Corp., 337 U.S. 541 (1949)            11

Cowles v. Kinzler, 225 F. Supp. 63 (W.D.PA. 1963)             14

Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.,
    341 F.2d 50 (2d Cir. 1965)                                 14

Dworsky v. Alanjay Bias Binding Co., 182 F.2d 803 (2d Cir.
    1950)                                                      16

English v. General Electric Co., 496 U.S. 72 (1990)            9

Fakouri v. Cadais, 147 F.2d 667 (5th Cir. 1945), cert. denied,
    326 U.S. 742                                               16

Florida Conference Association of Seventh-Day Adventists
    v. Kyriakides, 151 F.Supp.2d 1223 (C.D.CA. 2001)           14

Guaranty Trust Co. v. York, 326 U.S. 99 (1945)                11

Hanna v. Plumer, 380 U.S. 460 (1965)                          13

HBC Hamburg Bulk Carriers, GmbH & Co. KG v. Proteinas
    y Oleicos S.A. de C.V., 2005 U.S. Dist. LEXIS 8009
    (S.D.N.Y. May 4, 2005)                                    18

Iovino v. Waterson, 274 F.2d 41 (2d Cir. 1959), cert. denied
    sub nom. Carlin v. Iovino, 362 U.S. 949                   13

Iran Express Lines v. Sumatrop, AG, 563 F.2d 648 (4th Cir. 1977)    14

Kossick v. United Fruit Co., 365 U.S. 731 (1961)    10

Linea Naviera de Cabotaje, C.. v. Mar Caribe de Navigacion,
    C.A., 169 F.Supp.2d 1341 (M.D.FL. 2001)    4, 5, 14, 15

Maersk, Inc. v. Neewra, Inc., 2006 U.S. Dist. LEXIS 73096
    (S.D.N.Y. Oct. 6, 2006)    7

McNally v. The Port Authority of New York and New
    Jersey, 414 F.3d 352 (2d Cir. 2005)    9

Mississippi Pub. Corp. v. Murphree, 326 U.S. 438 (1946)    13

National Garment Co. v. New York, Chicago & St. Louis
    R.R. Co., 173 F.2d 32 (8th Cir. 1949)    15

New York State Conference of Blue Cross & Blue Shield
    Plans v. Travelers Ins. Co., 514 U.S. 645 (1995)    9

Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd., 2003
    U.S. Dist. LEXIS 23008 (S.D.N.Y. Dec. 24, 2003)    18

North Am. Phillips Corp. v. Emery Air Freight Corp., 579
    F.2d 229 (2d Cir. 1978)    15

Oil Transport Co., S.A. v. Hilton Oil Transport, 1994
    A.M.C. 2817 (S.D.TX. July 25, 1994)    15

Pavelic & LeFlore v. Marvel Entertainment Group, 493
    U.S. 120 (1989)    16, 17

Phillips v. Baker, 121 F.2d 752 (9th Cir. 1941), cert. denied,
    314 U.S. 688    16

Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41 (1987)    8

Public Utilities Commission of State of California v.
    United States, 355 U.S. 534 (1958)    8

Ray v. Morris, 170 F.2d 498 (7th Cir. 1948)    16

Rio Grand Motor Way, Inc. v. Resort Graphics, Inc., 740
    P.2d 517 (Colo. 1987)    15

Route Holding Inc. v. International Oil Overseas Inc., 06
    CIV 3428 (PKC) (unreported) .......... 5

Salazar v. The Atlantic Sun, 881 F.2d 73 (3d Cir. 1989) .......... 4

Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi
    S.A. de Navegacion, 732 F.2d 1543 (11th Cir. 1984) .......... 10, 11, 17

Seamar Shipping Corp v. Kremikovtzi Trade Ltd., 2006
    U.S. Dist. LEXIS 83834 (S.D.N.Y. Nov. 20, 2006) .......... 17, 18

Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983) .......... 9

Soliz v. Plunkett, 615 F.2d 272 (5th Cir. 1980) .......... 16

Southern Pacific Co. v. Jensen, 244 U.S. 205 (1916) .......... 13

Starmakers Publishing Corp. v. Acme Fast Freight, Inc.,
    615 F. Supp. 787 (S.D.N.Y. 1985) .......... 15

Trans-Asiatic Oil, Ltd. S.A. v. Apex Oil Co., 743 F.2d 956
    (1st Cir. 1984) .......... 11, 15

Ulisses Shipping Corp. v. FAL Shipping Co. Ltd., 415
    F.Supp.2d 318 (S.D.N.Y. 2006) .......... 5

United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993) .......... 6

Walker v. Armco Steel Corp., 446 U.S. 740 (1980) .......... 16

Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263 (2d
    Cir. 2002) .......... 6, 7, 13, 16, 17

Witt v. Merrill, 208 F.2d 285 (4th Cir. 1953) .......... 16

**Other Sources**

Thomas C. Baxter, Jr. and Raj Bhala, *The Interrelationship
    of Article 4A with Other Law*, 45 Bus. Law 1485 (1990) .......... 12

## PRELIMINARY STATEMENT

Plaintiff LOSINJKA PLOVIDBA (hereinafter, "LOSINJPLOV") respectfully submits this memorandum of law in opposition to the motion by Defendant CARGOBULK PTE LTD. (hereinafter, "CARGOBULK") to vacate the attachment in this matter. The facts of this matter are straightforward and are not in dispute.

## FACTS

Plaintiff LOSINJPLOV is the owner of the M/V MIRNA.   LOSINJPLOV chartered the vessel to an entity called Crossworld Middle East of Dubai, U.A.E. (hereinafter, "Crossworld").  The charter was for a length of time and was on a modified New York Produce Exchange form.  Crossworld, in turn, sub-chartered the M/V MIRNA to Defendant AZELIE CORPORATION (hereinafter, "AZELIE") for the carriage of a cargo of cashew nuts from Guinea Bissau to India.

LOSINJPLOV began having difficulties collecting charter hire from Crossworld at about the same time that AZELIE's nuts were being loaded on the ship.  It soon became apparent that Crossworld would be unable to fulfill its obligations under the charter with LOSINJPLOV[1] and LOSINJPLOV, in an effort to mitigate its losses, entered into discussions with AZELIE, all of which were through Defendant CARGOBULK PTE LTD. (hereinafter, "CARGOBULK").    AZELIE/CARGOBULK  agreed  to  pay LOSINJPLOV hire through the period when discharge was completed at India. Although not all the terms of this revised charter were agreed,[2] sufficient terms were agreed such

---

[1] Crossworld has apparently ceased doing business and many of its creditors have begun chasing Crossworld to collect on Crossworld's debts, meeting with frustration.

[2] LOSINJPLOV asserts that AZELIE/CARGOBULK agreed to a voyage charter on essentially the same terms as the former time charter with Crossworld.  AZELIE/CARGOBULK, however, forwarded to LOSINJPLOV terms and conditions that were somewhat different.  For example, both sets of terms provide for arbitration, with English law to apply, but LOSINJPLOV's terms provide for London as the venue, while AZELIE/CARGOBULK's terms provide for Singapore as the venue.

that a contract was formed and LOSINJPLOV undertook the carriage and transported the nuts to India, without incident. AZELIE/CARGOBULK, however, did not pay the full amount of hire owed for the transportation of the nuts. In particular, discharge operations at India took longer than anticipated, and the amount in dispute principally represents the unpaid hire and related expenses incurred during discharge for which charterers are responsible. Despite due demand, AZELIE/CARGOBULK have refused to pay the full amount of hire due.

In order to secure its claims against AZELIE/CARGOBULK, Plaintiff LOSINJPLOV moved this Court on or about December 1 for an order of attachment pursuant to Rule B in the amount of $175,916.32, to cover LOSINJPLOV's claim of $130,916.32 with respect to unpaid charter hire and expenses and the remainder to cover LOSINJPLOV's claim for recoverable attorneys fees and costs. LOSINJPLOV's application was granted, and Process of Maritime Attachment and Garnishment issued. The Process was served on a number of garnishee banks, including but not limited to The Bank of New York (hereinafter, "BONY").

Defendant AZELIE chartered the M/V EBER from a company called Sohtorik Denizcilik Sanayi ve Ticaret A.S., which required charter hire payments to be made by AZELIE to CLC Hellas Ltd. On December 5, 2006, CARGOBULK, with relation to AZELIE's charter of the M/V EBER, wired $403,725 on behalf of AZELIE to CLC Hellas. These funds were passed to BONY and BONY, pursuant to the Process served on it that day, restrained $175,916.32 (the maximum amount permitted under the order of attachment), and released the remainder. BONY's counsel advised the undersigned of

this restraint the next day, December 6, 2006.  Defendant CARGOBULK's motion to release the restrained funds followed.

## ARGUMENT

### Point I

### THE RESTRAINED FUNDS ARE PROPERTY OF AZELIE AND SO THE ATTACHMENT SHOULD BE MAINTAINED

CARGOBULK does not deny that LOSINJPLOV has a right to restrain property belonging to Defendant AZELIE.   There can be no doubt that AZELIE is LOSINJPLOV's contracting partner and that obligations to pay charter hire made by AZELIE have not been honored.  It is simply beyond dispute that LOSINJPLOV has a valid maritime attachment case against AZELIE.  Accordingly, any funds of AZELIE's are unquestionably subject to restraint.  CARGOBULK's objection to the attachment is, in part, based on the argument that it is not a proper defendant to the action and that the funds under restraint are its own, not AZELIE's, property.  CARGOBULK's application in this regard is extremely misleading.

The wire transfer details (see Ex. A to the Stembridge Declaration) make clear that the restrained funds were being wired by CARGOBULK in connection with charter hire for the M/V EBER, a vessel chartered by AZELIE. As set forth in the accompanying Stembridge Declaration, the EBER had been chartered by AZELIE from Sohtorik Denizcilik Sanayi ve Ticaret A.S. and required that payments be made to Sohtorik's manager, CLC Hellas Ltd.  Thus, it is clear that the funds under restraint represent payment of charter hire owed by AZELIE with respect to the charter of the M/V EBER and are properly subject to restraint as AZELIE's property.  See Stembridge Declaration ¶4 -6.

There can be only two reasons why CARGOBULK was wiring this money – either it did so as agent for AZELIE, or it did so because AZELIE and CARGOBULK are one and the same entity. CARGOBULK's application to this Court makes the allegation that it is solely an agent for AZELIE, and if this is correct, then the funds are unquestionably AZELIE's, are legitimately subject to the restraint, and CARGOBULK has no standing to seek vacatur. If on the other hand CARGOBULK and AZELIE are *alter egos* (which would be the alternate explanation for why CARGOBULK was paying charter hire on the M/V EBER), then CARGOBULK is liable to LOSINJPLOV and the restraint is proper.

Since the restrained funds are AZELIE's property, the restraint is proper and the Court need look no further into this alleged ground for vacatur.

### Point II

### LOSINJPLOV HAS SUFFICIENT EVIDENCE
### TO DEMONSTRATE A *PRIMA FACIE* CASE OF *ALTER EGO*

Defendant CARGOBULK has moved for vacatur of the attachment pursuant to Admiralty Rule E(4)(f) in part on the grounds that the attached funds were from its own account and that the allegations of the Verified Complaint are insufficient to cause the restraint of CARGOBULK's funds. As seen above, the restrained funds are actually the property of AZELIE, so the argument is groundless. Assuming *arguendo*, however, that the restrained funds were in fact CARGOBULK's, then the ground for the restraint must be that CARGOBULK and AZELIE are *alter egos*.

Rule E does not specify what form the post-attachment hearing must follow and the nature and scope of the hearing depends upon the issues in controversy. Salazar v. The Atlantic Sun, 881 F.2d 73, 79 (3d Cir. 1989); Linea Naviera de Cabotaje, C.A. v.

Mar Caribe de Navigacion, C.A., 169 F.Supp.2d 1341, 1357-59 (M.D.FL. 2001) ("Rule E does not restrict review [at the post attachment hearing] to the adequacy of the allegations in the complaint, nor does it echo the standards of the initial attachment that conditions appear to exist; rather Rule E requires plaintiff…to show why the attachment should not be vacated").

In Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F.Supp.2d 318, 323 (S.D.N.Y. 2006), the Court held that "[a]t a post-attachment hearing, a plaintiff asserting corporate alter egos need not definitively establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil", citing Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A., 169 F.Supp.2d 1341, 1359 (M.D.FL. 2001); A. Coker & Co. v. Nat'l Shipping Agency Corp, 1999 U.S. Dist. LEXIS 7442 (E.D.LA. May 18, 1999).   In Ulisses, the plaintiff sustained its burden at the E(4)(f) hearing by showing that one entity paid the debts of the other and that the two entities had overlapping ownership, management and purposes. Ulisses, 415 F.Supp.2d at 326. These factors were enough to suggest that the two entities did not operate at arms length and that one dominated and controlled the other. The Ulisses Court noted that in Linea, it was found that the offer by one company to pay the debts of the other in settlement negotiations was sufficient evidence of alter ego to prevent vacature at an E(4)(f) hearing. Id. at 326 n.62.[3]

Here, there is substantial evidence to support an alter ego allegation.   The evidence falls into roughly four categories:   (1) evidence that CARGOBULK pays

---

[3] Similarly, in an unreported decision in Route Holding Inc. v. International Oil Overseas Inc., 06 CIV 3428 (PKC), Judge Castel found that evidence that one company had paid the debts of another on several occasions was sufficient, on its own, to support an allegation of alter ego and to maintain an attachment of the alleged alter ego's funds.

monies on behalf of AZELIE (*see* Unger Affirmation,¶20 - 21) ; (2) evidence that AZELIE disregards its corporate form in the course of its communications (*see* Unger Affirmation ¶22); (3) evidence that AZELIE's employees are also employees of CARGOBULK and operate out of CARGOBULK's offices in Singapore (*see* Unger Affirmation, ¶23); and that CARGOBULK is severely under-capitalized, having a paid-up capital of only SPORE$1 (approximately US$0.65) (*see* Unger Affirmation, ¶24-25). It is respectfully submitted that the foregoing is sufficient to support a finding that there are reasonable grounds for piercing the corporate veil between CARGOBULK and AZELIE, which is all that is required to be shown in order to maintain the attachment of CARGOBULK's funds (to the extent that the funds do, in fact, belong to CARGOBULK, which is denied).

### Point III

### NEW YORK UCC ARTICLE 4A IS INAPPLICABLE TO, AND IS PREEMPTED BY, ADMIRALTY RULE B

The fallback position relied upon by CARGOBULK in support of its motion, that New York's UCC Article 4A bars the restraint of electronic funds transfers ("EFTs"), is incorrect. It is the well-established law of this Circuit that EFTs are property subject to restraint under Rule B. Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263, 278 (2d Cir. 2002) ("[i]t follows that from the broad, inclusive language of Admiralty Rule B(1)(a) and the EFT analysis in [United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993)] combine to fashion a rule in this Circuit that EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)"); Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 436 (2d Cir. 2006) ("[u]nder the law of this circuit, EFT's

to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction").[4]  The property restrained in the instant matter was in the form of an EFT transferred from Defendant CARGOBULK to a third party.  Accordingly, it represents attachable property.

As indicated in <u>Winter Storm</u>, it does not matter that the subject of the wire was unrelated to the events giving rise to the dispute between Plaintiff and Defendants herein.

> The property attached need not have a direct connection to the claim sued upon, since Rule B(1)(a), broadly phrased, allows attachment of "the defendant's tangible or intangible personal property," limited only by "the amount sued for".  The case at bar is illustrative; TPI's funds attached by Winter Storm in the hands of BNY were generated by a transaction bearing no relationship to the charter party underlying Winter Storm's claim.

<u>Winter Storm</u>, 310 F.3d at 268.

The Supreme Court, in <u>American Dredging Co. v. Miller</u>, 510 U.S. 443, 446-47 (1994) held that states may adopt remedies and procedures that do "not attempt to make changes in the substantive maritime law".  A change in the substantive maritime law occurs when a state remedy "works a material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." <u>Id.</u>

---

[4] The <u>Aqua Stoli</u> decision contains a footnote that questions the correctness of the initial holding in <u>Winter Storm</u> that EFT's are attachable property. <u>Aqua Stoli</u>, 460 F.3d at 446 n.6.  This footnote, however, does not change the established law of the Circuit that EFT's are attachable. <u>See</u> <u>Maersk, Inc. v. Neewra, Inc.</u>, 2006 U.S. Dist. LEXIS 73096, *4-5 (S.D.N.Y. Oct. 6, 2006) ("[t]hat the court of appeals made mention, in a footnote, of a reason why <u>Winter Storm</u> might have been incorrectly decided is of no moment.  Indeed, <u>Aqua Stoli</u> can only be read to reaffirm <u>Winter Storm</u> as the law of this circuit.") <u>See also</u> <u>Allied Marine Services Ltd. v. LMJ International Ltd.</u>, 06 CIV 3641 (LAK) (same) (unreported, copy attached to Unger Affirmation as Ex. 4).

1.    **The Doctrine of Preemption - Generally**

The doctrine of preemption is rooted in the Supremacy Clause of the Constitution,
which provides that the laws of the United States "shall be the supreme law of the land".
U.S. Const. Art. VI.   The Supremacy Clause has been repeatedly held to grant Congress
the power to preempt state law, including both positive enactments and the common law.
*See, e.g.,* Public Utilities Commission of State of California v. United States, 355 U.S.
534 (1958).

The ultimate touchstone of preemption is congressional intent.  Pilot Life Ins. Co.
v. Dedeaux, 481 U.S. 41, 45 (1987).  When considering claims of preemption, courts
weigh three principles – federalism, predictability, and ease of administration.  The first
and most important principle is federalism, which requires a balancing of the federal
government's interest in national regulation against the state government's desire to
regulate its own interests and maintain its "sphere of power".  There are a variety of
circumstances under which a state statue or law can be preempted, including express,
implied and field preemption.

Express preemption occurs when Congress drafts a statute that includes language
explicitly stating that the federal statute preempts state law; the presence of a preemption
clause in a federal statute clearly demonstrates a congressional intent to preempt.  Implied
preemption, on the other hand, looks to the substantive provisions of the federal statute
for evidence of congressional intent to preempt.  Field preemption exists when the
wording of a federal statute or its legislative history indicates the intent of Congress to
exclusively occupy a given regulatory field.  Finally, conflict preemption arises when

compliance with both state and federal law is impossible or when state law frustrates a federal objective. *See* English v. General Electric Co., 496 U.S. 72, 78-79 (1990).

Ultimately, whether preemption is found to be express or implied, though, the final result is the same – the relevant state law is rendered inoperable.

**2.    The Enacting Legislation for the Federal Rules of Civil Procedure Contains a Preemption Clause that Renders Conflicting State Law Ineffective**

As the Second Circuit found in McNally v. The Port Authority of New York and New Jersey, 414 F.3d 352, 371 (2d Cir. 2005), "[s]ince the existence of preemption turns on Congress's intent, we are to 'begin as we do in any exercise of statutory construction[,] with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs", *quoting* New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995) *and citing* Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95 (1983).

The relevant provision in the context of this case involving the interpretation and application of the Supplemental Rules is the Act of June 19, 1934, Chap. 651 (48 Stat. 1064), in which Congress granted the Supreme Court the power:

> **to prescribe, by general rules, for the district courts of the United States...the practice and procedure in civil actions at law....thereafter all laws in conflict therewith shall be of no further force or effect.**

Clearly, this statute contains a direct and unambiguous preemption clause.  In response to this Act, the Supreme Court adopted the Federal Rules of Civil Procedure, which, since 1966, includes the Supplemental Rules for Certain Admiralty and Maritime Claims (the "Admiralty Rules").

The Constitution also federalized maritime law, rendering maritime law "supreme" in comparison with state laws. <u>Kossick v. United Fruit Co.</u>, 365 U.S. 731, 738-39 (1961). An expression of this federalism is found in the many features of maritime law that are unique and without state law equivalents: salvage, arrest and attachment of maritime property, and general average are but a few. Whenever federal rules applicable to maritime law are clear and well-established, inconsistencies in state laws are supplanted by federal maritime law because of the supremacy of federal maritime law. In <u>Kossick,</u> for example, the Court held that an action on an oral contract was governed by the maritime rule validating oral contracts, and not by the state statute of frauds, which would have produced a contrary result. <u>Id.</u>

The Admiralty Rules govern four uniquely maritime procedures: (i) maritime attachment and garnishment; actions *in rem*; possessory, petitory and partition actions; and actions for exoneration from or limitation of liability. *See* Rule A. The Admiralty Rules are a necessary feature of the Federal Rules adopted pursuant to the Act. Rule B of the Admiralty Rules, which concerns maritime attachment and garnishment, is but one of many federal rules prescribed pursuant to the Act of June 19, 1934. Pursuant to the express terms of the enacting statute and to the extent that Rule B conflicts with UCC Article 4A, the latter can be of no force or effect as it is inferior to federal maritime law. Indeed, with regard to the deference to be given to Rule B, it has been held that:

> [The admiralty rules'] lineage sets them apart from common law based sequestration, garnishment, and attachment laws developed by the legislatures of the several states. As offspring of the very institution charged with mandating the procedural safeguards required before property may be taken, Supplemental Rules for Admiralty must be reviewed with special deference.

_Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion_, 732 F.2d 1543, 1549 (11th Cir. 1984).  In quoting this passage in another matter, the First Circuit hastened to "add that admiralty defendants are more likely to be shipping corporations and other commercial organizations than they are to be poor debtors, indigents or people needing special protection from the courts.  Indeed, the creditor, if a seaman or small supplier, may more often be the one in need of special protections."  _Trans-Asiatic Oil, Ltd. S.A. v. Apex Oil Co._, 743 F.2d 956, 961 (1st Cir. 1984).

There can be no doubt of Congress's long-recognized power to prescribe rules for the federal courts even in the face of the fact that some of those rules will inevitably differ from comparable state rules.  "When, because the plaintiff happens to be a non-resident, such a right is enforceable in federal as well as in a State court, the forms and mode of enforcing the right may, at times, naturally enough, vary because the two judicial systems are not identic."  _Guaranty Trust Co. v. York_, 326 U.S. 99, 108 (1945); _Cohen v. Beneficial Loan Corp._, 337 U.S. 541, 555 (1949).

Based upon the foregoing, in matters dealing with the interpretation, enforcement and scope of the Federal Rules, more specifically the Admiralty Rules, any state legislation which conflicts with or restricts Federal Admiralty law is rendered ineffective by virtue of the express preemption provision of the Act of June 19, 1934, and it is to that point which we now turn.

### 3.    The Immunity Provided to Intermediary Banks By UCC Article 4A is Preempted by Rule B

It is worth noting at the outset that the drafters of UCC Article 4A perceived that conflicts would arise between provisions of Article 4A and federal law, and in comment 3 to §4A-107, noted that "*federal preemption would make ineffective any Article 4A*

*provision that conflicts with federal law*" (emphasis supplied).   Commentators agree:

"Article 4A did not develop nor will it grow in an hermetically sealed environment.  To

the contrary, the Drafting Committee intended that Article 4A would be supplemented,

enhanced, and in some places, super[s]eded by other bodies of law."  Thomas C. Baxter,

Jr. and Raj Bhala, *The Interrelationship of Article 4A with Other Law*, 45 Bus. Law 1485

(1990).  Given this background, we now turn to the operative sections of Article 4A at

issue herein.

The text of UCC Article 4A provides that intermediary banks to an electronic

funds transfer need not act with respect to creditor process served upon them (NY UCC

§4A-502), and that courts are prohibited from restraining intermediary banks from

executing electronic funds transfer payment orders (NY UCC §4A-503).

On their face, with respect to federal litigation, these state law provisions subject

orders and processes issued by federal courts, including a Rule B Process of Maritime

Attachment and Garnishment ("PMAG") to state control by exempting banks operating

in certain capacities from responding to the legitimate orders of a federal judge.  In so

doing, it is well-established that such state statutes place impermissible strictures on the

power of the federal courts and are therefore *per se* preempted and invalid with respect to

actions before federal courts:

> [t]o hold that a Federal Rule of Civil Procedure must cease
> to function whenever it alters the mode of enforcing state-
> created rights would be to disembowel either the
> Constitution's grant of power over federal procedure or
> Congress' attempt to exercise that power in the Enabling
> Act.

Hanna v. Plumer, 380 U.S. 460, 473-74 (1965), *citing* Mississippi Pub. Corp. v. Murphree, 326 U.S. 438, 445-446 (1946) and Iovino v. Waterson, 274 F.2d 41, 46 (2d Cir. 1959), *cert. denied sub nom.* Carlin v. Iovino, 362 U.S. 949.

In this context, the Supreme Court, in Southern Pacific Co. v. Jensen, 244 U.S. 205, 216 (1916), held that state legislation was invalid if it "works a material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." Applying the Jensen criteria, the Court in Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2003) determined that attachment, being a characteristic of the general maritime law, could not be restricted by operation of the artificial boundaries set up to shield intermediary banks by UCC Article 4A.

> Maritime attachment is centuries old. "The use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty…has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." Atkins v. Fibre Disintegrating Co., 85 U.S. (18 Wall.) 272, 303, 21 L.Ed. 841 (1873). As early as 1825, the Supreme Court was able to say of the right of attachment in *in personam* admiralty cases that "[t]his Court has entertained such suits too often, without hesitation, to permit the right now to be questioned." Manro v. Almeida, 23 U.S. (10 Wheat.) 473, 486, 6 L.Ed. 369 (1825). "[M]aritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844." Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44, 47 (2d Cir. 1996).

Winter Storm, 310 F.3d at 267-268.

Moving on, there can be no question that the application of this state law would work a material prejudice to the characteristic features of this admiralty mechanism.

Applying the UCC would severely limit the scope of Rule B, in contravention to both the language of the rule itself and the judicial interpretation of it. Federal Admiralty Law has broadly defined the scope of attachable property, requiring only the showing of an "interest" in the property, but not title to it or exclusive ownership: Admiralty Rule B provides in pertinent part that provided certain criteria are met, a maritime plaintiff may

> **attach the defendant's *tangible or intangible* personal property – up to the amount sued for – in the hands of garnishees named in the process.**

Rule B(1)(a) (emphasis added). In interpreting what type of property is attachable under Rule B, district courts both in this Circuit and nationwide have regularly found that if the defendant has any form of a recognizable interest in almost any type of property, it is attachable under the Rule.[5] This includes any goods, chattels, credits, or effects of the defendant (Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50 (2d Cir. 1965)), as well as intangible items, such as debts, even if they have not yet matured or have only partially matured (Iran Express Lines v. Sumatrop, AG, 563 F.2d 648 (4th Cir. 1977); Cowles v. Kinzler, 225 F. Supp. 63 (W.D.PA. 1963)). Due to the broad language contained in the Rule, courts have found that restrictions such as title or ownership are not the controlling factors, but rather any manner of interest in property will suffice to enable a restraint under Rule B. *See, e.g.*, Florida Conference Association of Seventh-Day Adventists v. Kyriakides, 151 F.Supp.2d 1223 (C.D.CA. 2001) (approving the attachment of part of a promissory note, despite the fact that the debt was not due or payable at the time, because the promissory note evidenced a debt which was "tangible or intangible property" under Rule B); Linea Naviera de Cabotaje C.A. v. Mar

---

[5] For reasons that are largely historic, real property appears to be the only form of property which is not attachable under Rule B. *See, e.g.*, Harriman v. Rockaway Beach Pier Co., 5 F. 461 (E.D.N.Y. 1880) and Louisiana Ins. Co. v. Nickerson, 15 F.Cas. 967 (D.MA. 1874) (No. 8,539).

Caribe de Navegacion C.A., 1999 U.S. Dist. LEXIS 22500 (M.D.FL. Nov. 18, 1999) (sustaining the attachment of the bank accounts of two companies arguably related to the defendants, on the basis that there were reasonable grounds to believe that the bank accounts were controlled by the defendant); Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co., 743 F.2d 956 (1st Cir. 1984) (affirming the maintenance of an attachment of a debt owed by a third party in Puerto Rico to the defendant); Oil Transport Co., S.A. v. Hilton Oil Transport, 1994 A.M.C. 2817 (S.D.TX. July 25, 1994) (permitting attachment of arbitration award rendered in New York in favor of defendant).

In fact, the displacement of the UCC in favor of federal law is the general rule, not the exception. See, e.g., Starmakers Publishing Corp. v. Acme Fast Freight, Inc., 615 F. Supp. 787, 791 (S.D.N.Y. 1985) (holding that with respect to interstate shipments, the Interstate Commerce Act, not the UCC, is the governing law); North Am. Phillips Corp. v. Emery Air Freight Corp., 579 F.2d 229, 233-34 (2d Cir. 1978) (stating that federal law preempts all state law in the field of interstate shipment of freight); National Garment Co. v. New York, Chicago & St. Louis R.R. Co., 173 F.2d 32, 35 (8th Cir. 1949) (holding that federal law preempts state law with respect to the interpretation of bills of lading); Rio Grand Motor Way, Inc. v. Resort Graphics, Inc., 740 P.2d 517, 520 (Colo. 1987) (holding that, where state law under the UCC governing warehouseman's liens conflicted with federal provisions, the federal law preempted state UCC law).

The suggestion that application of NY UCC Article 4A is necessary because there is a supposed dearth of Federal Admiralty Law on point is simply wrong. The cases noted above, together with the plain language in the Rule and 200 plus years of

jurisprudence on the scope of maritime attachment make clear that there is already ample authority, and thus no "hole" that requires filling.

### 4.   The Rules of Statutory Interpretation Reinforce the Point that Application of the UCC is Inappropriate

The Supreme Court has admonished that in interpreting the meaning of terms found in the Federal Rules of Civil Procedure, "the Federal Rules should be given their plain meaning." Walker v. Armco Steel Corp., 446 U.S. 740, 750 (1980).   The "[i]nterpretation of [a] statute is guided by the rules of statutory construction, the plain meaning of the statute's terms, previous court interpretations, the interpretation of the…administrative agency charged with administration of the statute, and the legislative history of the Act." Soliz v. Plunkett, 615 F.2d 272, 275 (5th Cir. 1980).

It is well-established that the Federal Rules of Civil Procedure are interpreted in the same manner as statutes.   "As with a statute, our inquiry is complete if we find the text of the Rule to be clear and unambiguous." Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 540-41 (1991).   In determining whether the text of the Rule is clear and unambiguous, courts are to "give the Federal Rules of Civil Procedure their plain meaning." Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 123 (1989).   The Rules themselves are also to be interpreted broadly. Dworsky v. Alanjay Bias Binding Co., 182 F.2d 803 (2d Cir. 1950); Phillips v. Baker, 121 F.2d 752 (9th Cir. 1941), cert. denied, 314 U.S. 688; Ray v. Morris, 170 F.2d 498 (7th Cir. 1948); Fakouri v. Cadais, 147 F.2d 667 (5th Cir. 1945), cert. denied, 326 U.S. 742; Witt v. Merrill, 208 F.2d 285 (4th Cir. 1953).

The Winter Storm Court, in determining the plain meaning of Rule B with regard to what property is attachable under the Rule, noted that "it is difficult to imagine words

more broadly inclusive than 'tangible or intangible.'  What manner of thing can be neither tangible nor intangible and yet still be 'property?'" <u>Winter Storm</u>, 310 F.3d at 276.  In <u>Winter Storm</u>, the Second Circuit found that the plain meaning of the Rule was clear, given the ordinary meaning of its terms.  Accordingly, the inquiry was complete and there was no cause to look to supplement the meaning of the Rule with, for example, state law such as UCC Article 4A.[6]

Any attempt to incorporate the strictures of UCC Article 4A into Rule B must be resisted.  Any such effort would be inconsistent with the Court's role in determining the meaning of Rule B:  "our task is not to decide what the rule should be, but rather to determine what it is.  Once we conclude that [a Rule] speaks to the matter at issue, our inquiry is complete." <u>Business Guides</u>, 498 U.S. at 549, *citing* <u>Pavelic & LeFlore</u>, 493 U.S. at 126.  This is so, even if the Court feels that the less plausible reading of the Rule achieves a better result than the natural reading of the Rule.  <u>Pavelic & LeFlore</u>, 493 U.S. at 126-27.  Unnatural readings that have no basis in the intent of the Advisory Committee as set forth in the Advisory Committee Notes are to be rejected.  <u>Business Guides</u>, 498 U.S. at 544.

### 5. <u>CARGOBULK's Reliance on *Seamar* is Entirely Misplaced</u>

CARGOBULK's application to vacate the attachment relies in part on the recent decision by Judge Rakoff in <u>Seamar Shipping Corp v. Kremikovtzi Trade Ltd.</u>, 2006 U.S. Dist. LEXIS 83834 (S.D.N.Y. Nov. 20, 2006) in order to support the finding that New York's UCC should displace Rule B.  CARGOBULK's reliance on this case is entirely

---

[6] Rule B's very presence within the Federal Rules also makes it clear that there was an intent to distinguish maritime attachments from state law-based attachments.  There is already a federal rule (Rule 64) which authorizes attachment using state court procedures.  It would be an unnatural reading of Rule B to find that the Federal Rules contained two separate, but otherwise identical, rules of attachment.  *See also* <u>Schiffahartsgesellschaft</u>, 732 F.2d at 1549.

misplaced. First, for the reasons set forth above concerning the law of this Circuit regarding the attachability of EFT's and the preemption of UCC Article 4A by Rule B, and with all due respect to Judge Rakoff, the <u>Seamar</u> decision appears to be incorrect.

<u>Seamar</u> attempts to distinguish between the Rule B attachability of EFT's being transferred by a defendant and those being transferred to a defendant. Whereas even the <u>Seamar</u> decision holds that EFT's being transferred by a defendant are subject to attachment, the decision attempts to hold that EFT's being transferred to a defendant are not attachable while in the hands of an intermediary bank because the defendant does not yet have an ownership interest in those funds. The decision flies in the face of the well-established Rule, repeated in <u>Aqua Stoli</u>, that EFT's being sent to or from a defendant are attachable <u>Aqua Stoli</u>, 460 F.3d at 436; *see also* <u>Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd.</u>, 2003 U.S. Dist. LEXIS 23008 (S.D.N.Y. Dec. 24, 2003); <u>HBC Hamburg Bulk Carriers, GmbH & Co. KG v. Proteinas y Oleicos S.A. de C.V.</u>, 2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. May 4, 2005).

In any event, however, CARGOBULK is not in a <u>Seamar</u>-type of situation, because here, CARGOBULK is a defendant and is the sender of the EFT. Accordingly, the exception that Judge Rakoff has attempted to carve out in <u>Seamar</u> is inapplicable to the facts of this matter.

## CONCLUSION

For all the foregoing reasons, the application by CARGOBULK to vacate the attachment should be dismissed and the attachment should be maintained.

Dated: New York, New York
       December 18, 2006

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff Losinjka Plovidba

By: _____

Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax