568-06/MEU

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

LOSINJKA PLOVIDBA,

                           Plaintiff,

      -against-

AZELIE CORPORATION and CARGOBULK
PTE LTD.,

                           Defendants.
------------------------------------------------------------x

06 CIV 13627 (LAP)

## PLAINTIFF'S SECOND SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION TO MOTION BY DEFENDANT CARGOBULK TO VACATE THE ATTACHMENT RESPONDING TO ISSUES OTHER THAN DEFENDANT'S ARGUMENTS CONCERNING AFTER-ACQUIRED PROPERTY

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff Losinjka Plovidba
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax

Of Counsel:
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

NYDOCS1/276396.1

# TABLE OF CONTENTS

Table of Authorities..................................................................................ii

PRELIMINARY STATEMENT.................................................................1

INTRODUCTION......................................................................................1

ARGUMENT

      POINT I

      AZELIE HAS A PROPERTY INTEREST
      IN THE ATTACHED FUNDS; ACCORDINGLY,
      THE RESTRAINT IS PROPER...................................................3

      POINT II

      LOSINJPLOV MEETS ITS *PRIMA FACIE*
      BURDEN OF DEMONSTRATING ALTER
      EGO................................................................................................7

      POINT III

      CARGOBULK'S RELIANCE ON *SEAMAR* IS
      UNAVAILING...............................................................................11

      CONCLUSION.........................................................................................14


# TABLE OF AUTHORITIES

## Cases

A. Coker & Co. v. Nat'l Shipping Agency Corp, 1999 U.S. Dist.
LEXIS 7442 (E.D.LA. May 18, 1999).................................................................7

Allied Marine Services Ltd. v. LMJ International Ltd. (S.D.N.Y. Dec.
8, 2006, unpublished), 06 CIV 3641(LAK)........................................................13

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434
(2d Cir. 2006)...................................................................................................12

Cowles v. Kinzler, 225 F. Supp. 63 (W.D.PA.
1963)...................................................................................................................5

Det Bergenske Dampskibsselskab v. Sabre Shipping Corp,
341 F. 2d 50 (2d Cir. 1965)................................................................................5

Engineering Equipment Co. v. S.S. SELENE, 446 F. Supp.
706 (S.D.N.Y. 1978).......................................................................................6, 13

Florida Conference Association of Seventh-Day Adventists v. Kyriakides,
151 F.Supp.2d 1223 (C.D.CA. 2001)...............................................................5, 6

Guilder v. Corinth Construction Corp., 651 N.Y.S.2d 706
(3d Dept. 1997)...................................................................................................9

Harriman v. Rockaway Beach Pier Co., 5 F. 461 (E.D.N.Y.
1880)...................................................................................................................5

HBC Hamburg Bulk Carriers GmbH & Co. KG v. Proteinas y Oleicos S.A. de C.V.
2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. May 4, 2005).......................................13

Iran Express Lines v. Sumatrop, AG, 563 F.2d 648 (4th Cir.
1977)................................................................................................................5, 6

Linea Naviera de Cabotaje C.A. v. Mar Caribe de Navegacion C.A.,
1999 U.S. Dist. LEXIS 22500 (M.D.FL. Nov. 18, 1999)..............................6, 7, 8

Louisiana Ins. Co. v. Nickerson, 15 F.Cas. 967 (D.MA.
1874) (No. 8,539).................................................................................................5

Maryland Tuna Corp. v. MS Benares, 429 F. 2d 307
(2d Cir. 1970) ....................................................................................................11

Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd., 2003 U.S.
    Dist. LEXIS 23008 (S.D.N.Y. Dec. 24, 2003)..................................12, 13

Oil Transport Co., S.A. v. Hilton Oil Transport, 1994 A.M.C.
    2817 (S.D.TX. July 25, 1994)..............................................................6

Robinson v. Shearer & Sons, Inc., 429 F.2d 83 (3d Cir.
    1970)...................................................................................................6

Rolls Royce Ind. Power (India) v. M.V. FRATZIS M, 1996 A.M.C.
    390 (S.D.N.Y. 1995) .........................................................................11

Route Holding Inc. v. International Oil Overseas Inc.,
    06 CIV 3428 (PKC) (unreported)........................................................8

Salazar v. Atlantic Sun, 881 F.2d 73 (3d Cir.
    1989)...................................................................................................7

Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., 2006 U.S. Dist.
    LEXIS 83834 (S.D.N.Y. Nov. 17, 2006)..................................11, 12, 13

Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co., 743 F.2d 956 (1st Cir.
    1984)...................................................................................................6

Ulisses Shipping Corp. v. FAL Shipping Co. Ltd., 415 F.Supp.2d
    318 (S.D.N.Y. 2006)........................................................................7, 8

Vamvaship Maritime Ltd. v. Shivnath Rai Harnarain (India) Ltd., 2006
    U.S. Dist. LEXIS 21114 (S.D.N.Y. Apr. 20, 2006).............................13

Winter Storm Shipping Ltd. v. TPI, 310 F. 3d 263 (2d Cir.
    2002)..............................................................................................5, 12

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
    933 F.2d 131 (2d Cir. 1991)............................................................8, 11

## PRELIMINARY STATEMENT

Plaintiff LOSINJPLOV respectfully submits this second sur-reply memorandum of law in further opposition to the motion by Defendant CARGOBULK to vacate the attachment in this matter. This Sur-Reply was authorized by the Court pursuant to the letter endorsed Order of December 21, 2006, as modified on January 9, 2007, and by agreement of the parties.

## INTRODUCTION

Ultimately, the present motion by CARGOBULK to vacate the attachment may be decided solely on the question of whether AZELIE had an interest in the funds that are currently under restraint. Those funds undeniably represented the payment of a debt of charter hire owed by AZELIE, so it does not matter who actually had title to the funds at the time of the restraint – rather, the question is whether AZELIE had an interest in those funds. This question must be answered in the affirmative, and accordingly, the funds are attachable property under Admiralty Rule B and the attachment should be maintained.

It comes as a surprise to LOSINJPLOV that CARGOBULK is now disputing that a contract was formed between LOSINJPLOV and AZELIE/CARGOBULK following the default of the charter by Crossworld Middle East of Dubai, U.A.E. ("Crossworld"), the original charterer of the M/V MIRNA from LOSINJPLOV and which sub-chartered the vessel to AZELIE.

AZELIE's/CARGOBULK's cargo of nuts had substantially already been loaded aboard LOSINJPLOV's vessel M/V MIRNA and was ready for the voyage to India from Guinea Bissau when Crossworld defaulted. CARGOBULK negotiated, purportedly on behalf of AZELIE, directly with LOSINJPLOV to arrange for the completion of loading,

carriage of the nuts on the M/V MIRNA, and ultimate discharge at India. In consideration of LOSINJPLOV's undertaking, AZELIE agreed to pay LOSINJPLOV an amount equal to the charter hire LOSINJPLOV would have earned from Crossworld. The accompanying Magaš Declaration and numerous exchanges of correspondence confirm that CARGOBULK negotiated this agreement with LOSINJPLOV. Much of this correspondence originates from CARGOBULK's Jimmy Wong, who now appears to disclaim the substance of these contemporaneous communications in his recent Declaration.

Although not all the terms of the carriage were agreed (*see, e.g.*, the exchange of terms annexed as Exhibits 6 and 7 to the Magaš Declaration, enough terms had been settled between the parties that LOSINJPLOV relied on the fact that a contract had been formed. LOSINJPLOV therefore permitted AZELIE/CARGOBULK to continue loading their nuts on the ship, undertook the voyage, and delivered the cargo at India as required by the agreement, all without incident. It is the failure of AZELIE/CARGOBULK to pay hire in full through the completion of discharge as agreed that is the basis for the suit. *See* Magaš Declaration, ¶33-36.

Plaintiff LOSINJPLOV's subsequent investigations in connection with this suit have led LOSINJPLOV to the conclusion that AZELIE and CARGOBULK are *alter egos* of one another, such that each company hides behind the other whenever it is convenient to do so in order to avoid lawful obligations. Evidence developed by LOSINJPLOV concerning the *alter ego* relationship is found in the accompanying Walters Declaration and is otherwise discussed more fully below.

Whether LOSINJPLOV has enough evidence at present to substantiate its *prima facie* case of *alter ego* so as to continue its suit against both AZELIE and CARGOBULK, or, more to the point, whether AZELIE and CARGOBULK are actually *alter egos* of one another, is irrelevant for the purposes of this motion, though. As is clear from the wire transfer details and the information provided in the previously submitted Stembridge Declaration (which has largely been confirmed by CARGOBULK and is certainly not denied by it), the wire transfer that was captured pursuant to the Rule B attachment order was a wire transfer being made by CARGOBULK to satisfy the debt of AZELIE to another. There can be no question, therefore, that AZELIE has a property interest in the monies being paid to satisfy its own debt. Accordingly, whether AZELIE forwarded the funds to CARGOBULK for CARGOBULK to pass along to the beneficiary, or whether CARGOBULK advanced these sums from its own funds in order to be reimbursed later by AZELIE is of no consequence. AZELIE has an attachable property interest in the funds that were restrained, and that is enough to continue the restraint of those funds now. The Court need look no further.

For the reasons set forth below, CARGOBULK's motion to vacate the attachment should be dismissed in all respects.

## ARGUMENT

### Point I

### AZELIE HAS A PROPERTY INTEREST IN THE ATTACHED FUNDS; ACCORDINGLY, THE RESTRAINT IS PROPER

It is established fact that CARGOBULK wired approximately $403,000 to CLC Hellas to pay charter hire on the M/V EBER on December 5, 2006. These funds passed

through The Bank of New York. Pursuant to the Process of Maritime Attachment and Garnishment ("PMAG") and the Court's Order that directed issuance of the PMAG, The Bank of New York restrained $175,916.32 (the maximum amount permitted under the order of attachment), and released the remainder.

CARGOBULK now argues that the funds being sent to CLC Hellas were its own and, therefore, should not be subject to attachment unless LOSINJPLOV can demonstrate an *alter ego* relationship (which CARGOBULK denies). CARGOBULK's argument blindly ignores the fact that regardless of whether the funds were advanced by CARGOBULK on the expectation of being reimbursed by AZELIE or whether AZELIE had put CARGOBULK in funds in advance to pay the charter hire on the M/V EBER is immaterial as under either circumstance, AZELIE had a property interest in those funds which interest was attachable pursuant to Admiralty Rule B.

There is no debate as to any of the following facts: (1) AZELIE chartered the M/V EBER from Sohtorik Denizcilik Sanayi ve Ticaret A.S. ("Sohtorik"); (2) the Sohtorik-AZELIE agreement required that payments made by AZELIE be to CLC Hellas Ltd.; (3) by December 5, 2006, AZELIE had a debt to Sohtorik for (*inter alia*) charter hire for the M/V EBER in the amount of approximately $403,000; (4) AZELIE instructed CARGOBULK (or CARGOBULK was otherwise obligated by its agreement with AZELIE) to pay CLC Hellas the $403,000 in satisfaction of AZELIE's debt to Sohtorik; and (5) it was part of this wire transfer that was captured pursuant to the PMAG in this action. It is beyond dispute that the $403,000 payment, of which the subject $176,000 was a part, represented the payment of a debt owed by AZELIE.

It is well established that debts are attachable property under Admiralty Rule B. Rule B provides in pertinent part that a maritime plaintiff may

> attach the defendant's *tangible or intangible* personal property – up to the amount sued for – in the hands of garnishees named in the process.

Rule B(1)(a) (emphasis added). In Winter Storm Shipping Ltd. v. TPI, 310 F.3d 263, 276 (2d Cir. 2002), the Second Circuit, in determining the plain meaning of Rule B with regard to what property is attachable under the Rule, noted that "it is difficult to imagine words more broadly inclusive than 'tangible or intangible.' What manner of thing can be neither tangible nor intangible and yet still be 'property?'"

Courts both in the Second Circuit and nationwide, in interpreting the scope of attachable property under Rule B, have regularly found that if the defendant has any form of a recognizable interest in almost any type of property, it is attachable under the Rule.[1] This includes any goods, chattels, credits, or effects of the defendant (Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50 (2d Cir. 1965)), as well as intangible items, such as debts, even if they have not yet matured or have only partially matured (Iran Express Lines v. Sumatrop, AG, 563 F.2d 648 (4th Cir. 1977); Cowles v. Kinzler, 225 F. Supp. 63 (W.D.PA. 1963)).

Courts have also regularly found that due to the broad language of the Rule, restrictions such as title or ownership do not control the scope of attachability of property under the Rule. Instead, any manner of interest in property is sufficient to permit restraint under Rule B. *See, e.g.*, Florida Conference Association of Seventh-Day Adventists v. Kyriakides, 151 F.Supp.2d 1223 (C.D.CA. 2001) (approving the attachment

---

[1] For reasons that are largely historic, real property appears to be the only form of property which is not attachable under Rule B. *See, e.g.*, Harriman v. Rockaway Beach Pier Co., 5 F. 461 (E.D.N.Y. 1880) and Louisiana Ins. Co. v. Nickerson, 15 F.Cas. 967 (D.MA. 1874) (No. 8,539).

of part of a promissory note, despite the fact that the debt was not due or payable at the time, because the promissory note evidenced a debt which was "tangible or intangible property" under Rule B); Linea Naviera de Cabotaje C.A. v. Mar Caribe de Navegacion C.A., 1999 U.S. Dist. LEXIS 22500 (M.D.FL. Nov. 18, 1999) (sustaining the attachment of the bank accounts of two companies arguably related to the defendants, on the basis that there were reasonable grounds to believe that the bank accounts were controlled by the defendant); Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co., 743 F.2d 956 (1st Cir. 1984) (affirming the maintenance of an attachment of a debt owed by a third party in Puerto Rico to the defendant); Oil Transport Co., S.A. v. Hilton Oil Transport, 1994 A.M.C. 2817 (S.D.TX. July 25, 1994) (permitting attachment of arbitration award rendered in New York in favor of defendant).

Engineering Equipment Co. v. S.S. SELENE, 446 F. Supp. 706, 708 (S.D.N.Y. 1978) is directly on point. The S.S. SELENE Court held that the obligation to pay charter hire is an attachable debt within the meaning of Rule B: the defendants "concede, as they must, that the Holt defendants' obligations to pay charter hire are attachable debts within the meaning of Rule B(1)" (*citing* Iran Express Lines, 563 F.2d at 650; Robinson v. Shearer & Sons, Inc., 429 F.2d 83, 85 (3d Cir. 1970)).

Accordingly, whether AZELIE forwarded funds to CARGOBULK to pass along to CLC Hellas, or whether CARGOBULK paid these funds out of its own reserves in anticipation of being reimbursed by AZELIE, is entirely irrelevant to the question of whether the funds were attachable.[2] It was AZELIE who chartered the M/V EBER, and

---

[2] To the extent that CARGOBULK and AZELIE are separate corporations and AZELIE has not reimbursed CARGOBULK for the full $403,000 expended on its behalf, CARGOBULK may have an issue to resolve with AZELIE, but this issue is separate and apart from the question of whether AZELIE has an attachable property interest in the satisfaction of its own debts.

NYDOCS1/276396.1                                6

it was therefore AZELIE's contractual obligation to pay the charter hire for which it was indebted. That the payment was being paid in the first instance by another at AZELIE's request is of no consequence. The debt was AZELIE's and it was therefore attachable under Rule B. The inquiry ends here and the Court need go no further.

**Point II**

**LOSINJPLOV MEETS ITS *PRIMA FACIE* BURDEN
OF DEMONSTRATING *ALTER EGO***

In the context of a Rule E(4)(f) hearing, the Plaintiff is not required to prove his case with the same level of proof that would be required at trial. The Rule E(4)(f) hearing "is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant." Salazar v. Atlantic Sun, 881 F.2d 73, 79-80 (3d Cir. 1989). Accordingly, all that need be shown is that the attachment was "reasonable". Ulisses Shipping Corp. v. FAL Shipping Co. Ltd., 415 F.Supp.2d 318, 322-23 (S.D.N.Y. 2006). In Ulisses, with respect to the specific issue of an attachment against the alleged *alter ego* of the primary defendant, the Court held that "[a]t a post-attachment hearing, a plaintiff asserting corporate alter egos need not definitively establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil", *citing* Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A., 169 F.Supp.2d 1341, 1359 (M.D.FL. 2001); A. Coker & Co. v. Nat'l Shipping Agency Corp, 1999 U.S. Dist. LEXIS 7442 (E.D.LA. May 18, 1999).

In Ulisses, the plaintiff sustained its burden at the E(4)(f) hearing by showing that one entity paid the debts of the other and that the two entities had overlapping ownership, management and purposes. Ulisses, 415 F.Supp.2d at 326. These factors alone were

enough to suggest that the two entities did not operate at arms length and that one dominated and controlled the other. The Ulisses Court noted that in Linea, it was found that the offer by one company to pay the debts of the other was in and of itself sufficient evidence of *alter ego* to prevent vacatur at an E(4)(f) hearing. Id. at 326 n.62.[3]

The well-recognized factors that tend to show that an *alter ego* relationship may be present are the following:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like;
(2) inadequate capitalization;
(3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes;
(4) overlap in ownership, officers, directors, and personnel;
(5) common office space, address and telephone numbers of corporate entities;
(6) the amount of business discretion displayed by the allegedly dominated corporation;
(7) whether the related corporations deal with the dominated corporation at arms length;
(8) whether the corporations are treated as independent profit centers;
(9) the payment or guarantee of debts of the dominated corporation by other corporations in the group;
(10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131 (2d Cir. 1991). No one of these factors is decisive, and any one of these factors may be sufficient to show the requisite domination and control. Moreover, New York recognizes the concept of "equitable ownership" for veil-piercing purposes. To establish equitable ownership, the plaintiff need only show that one entity exercised sufficient control over the dominated company to be deemed its "equitable owner" notwithstanding the fact that

---

[3] Similarly, in an unreported decision in Route Holding Inc. v. International Oil Overseas Inc., 06 CIV 3428 (PKC), Judge Castel found that evidence that one company had paid the debts of another on several occasions was sufficient, on its own, to support an allegation of alter ego and to maintain an attachment of the alleged alter ego's funds.

the dominating entity is not a shareholder of the corporation. <u>Guilder v. Corinth Construction Corp.</u>, 651 N.Y.S.2d 706, 707 (3d Dept. 1997).

Here, LOSINJPLOV has submitted evidence that supports several of these factors in showing that AZELIE and CARGOBULK are *alter egos*. The Walters Declaration, submitted herewith, demonstrates that AZELIE appears not to have any actual existence at all and instead is nothing other than a corporate shell that incurs charter party obligations in order to ship the commodities traded by its ultimate principal, Olam International, and that CARGOBULK has no purpose but to manage AZELIE and distance it from Olam.

Concerning the factor of inadequate capitalization, we noted previously that CARGOBULK was capitalized only in the amount of one Singapore dollar (SGD 1, or approximately sixty-five US cents). In opposition, CARGOBULK notes that even in New York, corporations may be created with no capital at all. The creation of a company and the operation of a company though, are of course two completely different things. CARGOBULK's own assertions indicate that CARGOBULK is, in fact, substantially undercapitalized.

CARGOBULK alleges (Wong Declaration ¶12-13) that it moves on behalf of AZELIE hundreds of thousands of dollars at a time, ***from its own funds***, whenever AZELIE's contractual obligations to pay charter hire to others fall due. CARGOBULK indicates that it paid out some $520,000 on behalf of AZELIE with respect to the charter of the M/V KYRIAKOS M, $430,000 in a single payment on behalf of AZELIE with respect to the charter of the M/V EBER, and made similar transactions on behalf of AZELIE with respect to the charters of the M/V LIBRO DORO and the M/V DONG

SHUN OCEAN and other charter payments totaling some $620,000. AZELIE, according to the contract attached as Ex. 1 to the Wong Declaration, is remunerated only a mere SGD 10,000 (approximately $6,500) monthly (Clause 4.1). CARGOBULK appears to have no other clients but AZELIE (*see* Walters Declaration, ¶¶22-23, 28, and it is unclear how CARGOBULK can meet its operational costs, which includes the salaries of at least the three employees named by Mr. Wong – himself, "Dave" and "Yen" (Wong Declaration ¶5), on such a small sum.

CARGOBULK does not even earn any interest on the massive amounts of funds it advances on behalf of AZELIE, though given AZELIE's repayment history as only partially reflected in the Wong Declaration exhibits, CARGOBULK ought (at a minimum) demand interest, as would be common with a company that is advancing significant amounts of money on behalf of a supposedly independent entity. For example, CARGOBULK invoiced AZELIE for $120,000 to be paid with respect to the M/V KYRIAKOS M charter party on October 19, 2006. CARGOBULK paid the $120,000 the next day, and paid numerous other charges for AZELIE totaling some $520,000, but AZELIE appears not to have sent reimbursement until November 2, which CARGOBULK could not confirm arrived until November 3 (all as reflected in Ex. 4 to the Wong Declaration). Similarly, CARGOBULK advanced monies to pay the M/V LIBRO DORO charter hire on November 16, 2006 and invoiced AZELIE for same on November 20. CARGOBULK invoiced AZELIE for the M/V DONG SHUN OCEAN charter hire on November 21 and paid the hire on November 22. These advances, though, together with numerous others which were outstanding at the time, totaled some

$620,000, which was not reimbursed until November 30 (all as reflected in Ex. 5 to the Wong Declaration).

With regard to the Passalacqua factor that concerns independent business discretion, one need only look to the timing of the various emails attached as exhibits to the Wong Declaration and the Magaš Declaration to see that CARGOBULK frequently responded (purportedly as agent for AZELIE) too quickly to have been able to consult its principal, which reputedly was located in the Channel Islands (8 time-zone hours different from Singapore)[4] before making a representation on behalf of AZELIE. Accordingly, it appears that CARGOBULK enjoyed wide discretion to bind AZELIE without notice or specific consent.

The foregoing shows that there is substantial evidence of an *alter ego* relationship between AZELIE and CARGOBULK sufficient that it would be "reasonable" for the issuance of the attachment order.[5]

## Point III

### CARGOBULK'S RELIANCE ON *SEAMAR* IS UNAVAILING

Points III and IV of CARGOBULK's brief appear to make some form of a policy argument against attachment generally, based in part on Judge Rakoff's recent decision in Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., 2006 U.S. Dist. LEXIS 83834

---

[4] Or, if located in its place of incorporation, the British Virgin Islands (12 time zone hours from Singapore). That is, of course, unless AZELIE is also present in Singapore, but that is not what CARGOBULK suggests.

[5] To the extent that the Court deems additional evidence of *alter ego* necessary, Plaintiff respectfully requests the opportunity to take discovery of CARGOBULK. See Maryland Tuna Corp. v. MS Benares, 429 F.2d 307, 322 (2d Cir. 1970) (discovery permitted in respect to allegation that assets owned by one supposedly distinct corporation should in fact be considered an asset of the related defendant corporation); Rolls Royce Ind. Power (India) v. M.V. FRATZIS M, 1996 A.M.C. 390, 392 (S.D.N.Y. 1995) (Haight, J.) (discovery allowed on motion to vacate attachment to determine whether attachment reached assets of the named defendant).

(S.D.N.Y. Nov. 17, 2006). Any attempted reliance by CARGOBULK on Seamar, though, can only be said to be misplaced.

First, Seamar concerned a situation where the defendant was the beneficiary of the electronic funds transfer, which is not the case here – the defendants in this action are the senders of the funds transfer. Even under Seamar, which at least to this extent follows Winter Storm and Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 436 (2d Cir. 2006),[6] where the defendant is the sender of an electronic funds transfer, the funds are attachable under Rule B.

Secondly, and with all due respect to Judge Rakoff, the Seamar decision not only stands alone, it is inconsistent with all other decisional law of this District concerning maritime attachment. Several judges in this District have looked at the very same issue reviewed in Seamar, and have all come to a conclusion contrary to the one reached by Judge Rakoff in Seamar. The first judge to review this issue following the Second Circuit's decision in Winter Storm appears to have been Judge Cote. In Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd., 2003 U.S. Dist. LEXIS 23008 (S.D.N.Y. Dec. 24, 2003), the Court held that while the funds transfer from one side represented the movement of money, the flip side of the same transfer represented the cancellation of a debt owed to the defendant. Since there is a long history under Rule B of the ability to attach debts (matured and unmatured) as property, Judge Cote determined that EFT's transferred in either direction were attachable property under Rule B.

---

[6] The Second Circuit's decision in Winter Storm held generally that electronic funds transfers ("EFT's") were attachable property under Rule B. In Aqua Stoli, that Court clarified that "[u]nder the law of this circuit, EFT's to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction". Id. at 436.

The other decisions on this point in this District are consonant with Judge Cote's holding in Noble Shipping. *See, e.g.*, HBC Hamburg Bulk Carriers GmbH & Co. KG v. Proteinas y Oleicos S.A. de C.V., 2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. May 4, 2005) (Buchwald, J.); Vamvaship Maritime Ltd. v. Shivnath Rai Harnarain (India) Ltd., 2006 U.S. Dist. LEXIS 21114 (S.D.N.Y. Apr. 20, 2006) (Baer, J.); Allied Marine Services Ltd. v. LMJ International Ltd. (S.D.N.Y. Dec. 8, 2006, unpublished), 06 CIV 3641 (LAK) (Kaplan, J.). This list is by no means exhaustive. Seamar stands alone and it is perhaps for this reason that Judge Rakoff certified his own decision in that case for appeal.

To the extent that CARGOBULK has raised concerns related to Seamar about ownership of the funds, as set forth above, this issue is immaterial to the decision to be made by this Court, which is not who has title to the funds, but whether AZELIE has an attachable property interest in the funds. Since even CARGOBULK admits that the funds represent the payment of AZELIE's charter hire debt (Defendant's Brief at 6), the question of whether AZELIE has an attachable property interest in the funds can only be answered in the affirmative. S.S. SELENE, 446 F. Supp. at 708. Accordingly, the attachment should be maintained and CARGOBULK's motion should be dismissed in all respects.

## CONCLUSION

For all the foregoing reasons, the application by CARGOBULK to vacate the attachment should be dismissed and the attachment should be maintained.

Dated: New York, New York
January 18, 2007

By: 

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff Losinjka Plovidba

Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax